





May 3 2002

Hey dad how you doin. I not doin perfect but I'm livin. I love you very much. Do you know that? So how you doin I want to come see you! So you been livin? I seen jail I don't want to go there. I don't have much to say. I will send you some more when you get a chance love you, I'm at Kent general now but Jesus will straighten out my life.

Love you

Dear dad,

Whats up man! How is life treating you? Me ok I guess. There has been a lot of strange things happening in my life.

One of the things is I was pistol whipped. I never told Nana [illegible] not want to hear her complain. I got robbed. I am glad that [illegible] hustlin no more though. I started hustl[illegible] wanted to be fresh with clothes and shit like you [illegible] that I didn't want to have dirty money [illegible] I [illegible] way back feel me,

I was doing [illegible] I assaulted the principal. Then as of [illegible] [illegible] of an assault 1 charge I broke a 31 year old [illegible] nose I [illegible] even know I could hit hard so pops don't fuck with me I hit hard as a bitch, like Dad

So I am chillin. Nana wrote me she is ok but I am about to play spades I love that game I am a boss in that shit

[illegible] write me back as soon as you get this letter please?

[illegible] Nigga [illegible] One

Sincerely,

THIS IS A LETTER THAT I JUST RECEIVED FROM MY MOTHER.

Dear Pete,
It was so
and that at
right now [illegible]
controlling my blood sugar etc. Right
now things are looking good except
I am anemic. Gail was happy abo[ut]
her birthday card. We hung out [illegible]
the evening at Valeria's. The Afri[can]
Festival was on Saturday – very hot
Kraft Foods had great give aways.
I got to see and
they were excited to see me,
as I was to see them. They
have my phone number. Not much
happening, the girls (Danielle and [illegible])
are not here this morning. I have
been in the house during this heat.
Family reunion is coming up the
4th of July – hopefully I will
have some pictures to send you
after. As you know I [illegible]
been corresponding with

really worried about [illegible]
He is in need of [illegible]
intervention or [illegible] going [to]
lose him. As you know the
System does not give a damn
about our black youth and
does little to encourage them
to do positive things. Well
be patient and pray
fervently for your [illegible]
Send him all the positive
info you can.

Love Mom

P.S. I forgot to take the camera to the family reunion but I will tell you about it later.

10-16-04

Dad,

Hey how are you (Good I hope)? I'm doing just fine. Just been busy with school, practice (Bowling), games, doin reserech on becoming a vet and aginee's I can go to but haven't found anything yet, getting my group (rap) back together, and doing artwork [illegible]; Oh thanks for the super Autumn picture on envolpe. Could you send me one like that and one with me as a vet on paper I can frame please!! When you get out we're gonna have a big dinner with music and other stu I'm gonna have a motorcycle waiting just for you. Don't worry even though you only have 7 mor years you mite get out in three more years but you have to act better, do better, stay out the hole, and pray More. Just remember your not alone and if you make to best of yourself you'll be out soon.

Tear Drop of a young angle!!

P.S

Love ya always

Love ya,

please send me more drawings and I will send you more.

Please excuse my hand writting

4-16-05

Der Daddy,

Hey Daddy!! How are you doing & Great i hope. i've been good. Staying out of trouble, working hard, taking care of family. We got our house and i love it alot, but we're not completely settled which is fine. my rappings good, but no group. cuz i don't trust people. oh yeah the poem and song i sent you i wrote, good, huh & no fights have been broken out latley. Good thing!! i have a boy i talk to his name is Jared, he's 15, lives in chi-chest goes to chi-chester high school, and his birthd is November 4. we met at an buffet in Springfiled. Also i love you more than i love myself and sorry it took so long to write back. i the envolpe i've included two picture, 1 drawing, my dare report i got aprize from and etc. i have no new pics at this moment but will soon. when you get a chance can i get another drawn pic of me, it would make me so happy. I love you and always will be good. write back.

Love ya

June 13, 2005

Dear Daddy,

I got your picture plus letter not too long ago and you look good.

I've lost alot of weight myself about 12 pounds or so. Also last wednesday i graduated fith-grade and i don't got to go to summer school. Also Recently i got suspended for fighting this boy and hurting him bad but i had a reson too, cuz he disrespected me and put his hands on me. Also i am researching on street Racing. I work @ S.P.C.A. Oh, back to the Street Racing if you could get me some info i'd be glad cuz street Racing is what i'm gonna do in life but that's not all. I don't talk to Jared cuz his Phone got turned off and i need to get myself straight and things straight with this boy Named Will cuz i did him wrong and hurt his feelings. I didn't have much to say but know that your loved by not only family but G.O.D.

Love ya,

P.S.
Could you get a Picture of a Cheetha Drawn for me cuz my whole room is An... print

carries a statutory penalty of at least 5 and not more than 40 years in prison. Under count two of the indictment, and based on the events of July 17th, Mr. Moreland was convicted of possessing with the intent to distribute 1.92 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1), which carries a maximum penalty of 20 years in prison.

## II. Sentencing Procedure

In *United States v. Gray*, 2005 WL 613645 (S.D.W.Va.2005), I outlined my approach to criminal sentencing in light of the Supreme Court's decision to render the federal Guidelines advisory in *United States v. Booker*, — U.S. —, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The *Gray* opinion explained my resolution of several legal issues that lingered in *Booker's* wake, including ex post facto concerns, confrontation clause issues, and the appropriate role of the burden of proof at sentencing hearings under the advisory Guideline regime. In general, I determined that a three-step procedural process would best fulfill the sentencing mandate of the remedial *Booker* majority opinion. These steps are summarized as follows.

[1] First, at each sentencing, I calculate the advisory Guideline range in exactly the same manner as I calculated the Guideline range under the mandatory regime, including any potential upward or downward departures. Second, I consider the sentencing factors listed under 18 U.S.C. § 3553(a). Finally, I determine an appropriate sentence based on a careful evaluation of the Guideline advice and each of the § 3553(a) factors.

[2] Importantly, while I respect the advice of the Guidelines and give it serious consideration, I do not view that advice as carrying greater weight than any of the other § 3553(a) factors. That is, I do not view the advisory Guideline range as being "presumptively reasonable." I note that my sister district courts are split on the issue of how much deference to give the Guideline recommendation. *See, e.g., Simon v. United States*, 2005 WL 711916 (E.D.N.Y.2005) (noting that "district courts have differed as to the weight to be given to the formerly mandatory Guidelines" and comparing several different approaches). I have taken the position, articulated in *United States v. Ranum*, 353 F.Supp.2d 984 (E.D.Wis.2005) and other cases, that the proper treatment of the Guideline advice is to balance it with the other sentencing factors found in § 3553(a). I find this approach persuasive for two primary reasons. First, § 3553(a) itself accords no heightened importance to the Guidelines. Instead, it directs sentencing judges to consider various other factors, including several factors (such as age, education, and health) that are not thoroughly considered by the Guidelines themselves. Second, to treat the Guideline advice as presumptively reasonable is the equivalent of imposing a "*de facto* mandatory sentence" on a defendant. *Simon*, 361 F.Supp.2d at 40. A return to a mandatory Guideline sentencing regime would run squarely afoul of the merits majority in *Booker*.

At Mr. Moreland's sentencing, I first calculated his advisory Guideline range. I then analyzed each of the other § 3553(a) factors. Finally, after carefully taking all of this advice into account, I determined an appropriate sentence. I will summarize each of these procedural steps in turn.

## III. Advisory Guideline Calculations

[3] The November 1, 2004, edition of the United States Sentencing Commission Guidelines Manual was used in this case. First, the two counts of conviction were grouped pursuant to U.S.S.G. § 3D1.2(d), because both charges relate to cocaine base. The base offense level for a violation of 21 U.S.C. § 841(a)(1) is found in § 2D1.1(a)(3) and the Drug Quantity Table in § 2D1.1(c). Those sections provide for a base offense level of 26 if the offense involved at least 5 but less than 20 grams of cocaine base. The defendant's offenses of conviction involved a total of 7.85 grams of cocaine base. Accordingly, I found the base offense level to be 26.

I next examined the potential offense level adjustments and enhancements in this case, and found that only one was applicable. Specifically, I found that the defendant qualified as a Career Offender under § 4B1.1. That section states, in pertinent part:

> (a) A defendant is a Career Offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Mr. Moreland is 31 years old; his instant offense is a felony controlled substance offense; and he has two prior felony controlled substance offenses. Specifically, the first prior conviction occurred on July 10, 1992, when the defendant pled guilty to delivering a marijuana cigarette to an inmate in a prison. He was sentenced to 60 days in custody and placed on 60 months of probation. The defendant's second prior felony controlled substance offense occurred on October 21, 1996, when he pled guilty to possessing 6.92 grams of cocaine base. Mr. Moreland received a suspended sentence of incarceration for that offense and was placed on lifetime probation. Both of these sentencing dispositions occurred in the Michigan state court system.

The defendant's classification as a Career Offender had a drastic effect on his Guideline offense level. Pursuant to the table in § 4B1.1, the defendant's offense level jumped from 26 to 37, an increase of 11 points. Similarly, his criminal history level was re-adjusted. The defendant was first assessed five "real" criminal history points, which places him in Category III. Section 4B1.1(b), however, provides that "[a] career offender's criminal history category in every case under this subsection shall be Category VI." Mr. Moreland's criminal history therefore doubled from Category III to Category VI by virtue of his Career Offender status. Category VI is normally reserved for defendants with 13 or more criminal history points. A total offense level of 37 and a criminal history category of VI established an advisory Guideline range for Mr. Moreland of 360 months to life in prison. Before his arrest for the instant offense, he had cumulatively served less than six months in jail for his previous convictions.

## IV. 18 U.S.C. § 3553(a) Factors[1]

### A. *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

The instant offense did not involve a large amount of cocaine base. Specifically, the defendant sold 5.93 grams of cocaine base and possessed an additional 1.92 grams of cocaine base, for a grand total of 7.85 grams. The quantities of drugs involved fall somewhere between mere user amounts and heavy trafficking quantities. For the sake of perspective, two "Tic

1. The factors found under § 3553(a)(3), (5), and (7) had no bearing on the disposition of this case and will not be discussed.

Tacs" weigh one gram. The amount of cocaine base involved in this offense therefore equates to sixteen Tic Tacs. The defendant was clearly not in the business of distributing kilos of cocaine base.

Brian Moreland's offense involved no violence or threat of violence. He possessed no firearm or other weapon, and threatened no one. Further, neither of his two prior felony controlled substance offenses involved violence or firearms. If the instant offense had involved a gun, the nature and circumstances of the offense would certainly have been more dangerous to society. Although the defendant was clearly engaged in the distribution of cocaine base, the non-violent nature and circumstances of the instant offense must be considered as a mitigating factor.

Brian Antoine Moreland is a 31 year-old black male. He was born in Detroit, Michigan on April 12, 1973, and is in good health. His parents were never married. His father is 56 years old and still resides in Michigan, but the defendant's mother died from cirrhosis of the liver in 1999. The defendant himself is the father of one child, a twelve year-old boy who resides with his mother in Detroit. The defendant has not seen his son for a number of months and pays no child support.

Brian Moreland graduated from high school in 1991, and earned 13 college credits at a community college in Ann Arbor by the end of the summer of 1992. Since then, he has had a series of jobs, and in 2001 he returned to school to take computer courses. He has demonstrated that he has the ability and potential to become a productive member of society. He has not, however, shown a serious inclination to do so, as evidenced by his two prior convictions. Accordingly, the "characteristics of the defendant" indicate that Mr. Moreland needs the discipline of a corrective institution, but still has the capacity to change his ways and lead a fruitful life.

***B. The Need for the Sentence Imposed(1) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (2) to Afford Adequate Deterrence to Criminal Conduct; and (3) to Protect the Public from Further Crimes of the Defendant***

When applying these factors to Brian Moreland's case, it becomes clear that a sentence of ten years imprisonment, followed by eight years of supervised release is sufficient to achieve each of the sentencing goals outlined in § 3553(a). First, I find that this sentence is sufficient to reflect the seriousness of the offense. Brian Moreland was convicted of distribution/possession with the intent to distribute 7.85 grams of cocaine base. Without the application of the Career Offender enhancement, his guideline range would have been 78 to 97 months. A sentence of 120 months is well above that "pure" guideline range, and takes into account the fact that the present offense is not his first conviction. It is also undeniably a very substantial amount of time to spend in prison. Brian Moreland spent less than six months in jail for his previous offenses, and a sentence that takes ten years from his young life will certainly promote respect for the law.

Part of this inquiry, of course, requires me to consider and award a sentence that will provide "just punishment for the offense." In this case, I find that anything greater than the sentence imposed would not constitute a "just punishment" for Mr. Moreland's offense. As noted earlier, Mr. Moreland's guideline range jumped from a range of 78 to 97 months to a range of 30 years to life imprisonment following the application of the Career Offender enhancement. This enhancement provides for both an enhanced offense level and an enhanced criminal history for qualifying defendants. Section 4B1.1 of the United States Sentencing Guidelines provides for the application of this enhancement to defendants who meet certain requirements, including the requirement that "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." In § 4B1.2, the Guidelines cast a wide net, defining "controlled substance offense" as an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance... or the possession of a controlled substance (or a counterfeit substance) with the intent to manufacture import, export, distribute or dispense.

Any offense that falls within this definition is to be counted as a predicate offense, regardless of the amount of drugs involved, the actual punishment imposed, or the length of time between the prior and present offenses. Thus, this Guideline puts Brian Moreland's distribution of a single marijuana cigarette on par with a kingpin in a drug conspiracy who is convicted of distributing kilos of drugs or a violent offender who uses firearms or threats of harm to commit his crimes-all of these crimes count as predicate offenses for the application of this guideline provision. *See United States v. Carvajal,* 2005 WL 476125, *4, 2005 U.S. Dist. LEXIS 3076, *14-15 (S.D.N.Y.2005) (noting that "the Guidelines for Career Offenders are the same regardless of the severity of the crimes, the dangers posed to victims' and bystanders' lives, and other appropriate criteria," and departing from the guideline advice following the conclusion that "[a] sentence that satisfies only the Guidelines would be 'greater than necessary, to comply with the purposes' set forth in the statute.").

I find that the failure of this Guideline provision to take into account the variety of offenses that fit within this definition creates tension within the now advisory system. This advisory regime places great value on the sentencing factors outlined in § 3553(a). I am instructed to look at the nature, characteristics, and severity of the offense in question prior to sentencing. To fail to undertake a similar analysis on predicate offenses that increase the defendant's guideline range makes no sense.

It is clear to me that Brian Moreland is neither the "repeat violent offender" nor "drug trafficker" targeted by the Career Offender enhancement. The first of his predicate offenses occurred in 1992 when Moreland made the stupid and criminal decision to deliver a single marijuana cigarette to a prison inmate. The second offense occurred in 1996 when he pled guilty to "distribution/manufacture/possession" of less than 50 grams of cocaine base after he was arrested with 6.92 grams of cocaine base. These two offenses are significant, but they hardly constitute the type and pattern of offenses that would indicate that Mr. Moreland has made a career out of drug trafficking. Both offenses involved the distribution of small, user amounts of drugs, and both offenses lack temporal proximity to either each other or the present offense. In fact, the two prior offenses are, on average, a decade old. Furthermore, neither offense involved even the suggestion of violence and Mr. Moreland's criminal history is devoid of any violent or firearm offenses. To simply base the length of a sentence on the number of Mr Moreland's convictions without looking further into the details and circumstances of each offense would not produce justice in this case. Without the Career Offender

calculation, Mr. Moreland has a total of five criminal history points (two points are added to his original three because the instant offense occurred while Mr. Moreland was on lifetime probation), has spent a grand total of less than six months in jail for his predicate offenses, and has been convicted of distributing a "career" total of a mere 14.77 grams of cocaine base and a single marijuana cigarette.

Clearly, Brian Moreland has not engaged in a "career" of crime and has not subsisted on a criminal livelihood. He is a 31 year-old man who has made both good and bad decisions in his life. He has not, however, demonstrated the pattern of recidivism or violence that would justify disposal to prison for a period of 30 years to life. One of the goals of sentencing remains the rehabilitation of convicts. I find that Mr. Moreland has an excellent chance of turning his life around after he completes his substantial sentence. As the *Carvajal* court noted, the goal of rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment.... A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than necessary to satisfy the goals of punishment." *Carvajal*, 2005 WL 476125, at *4, 2005 U.S. Dist. LEXIS 3076, at *15–16. In the present case, a ten-year term of imprisonment, followed by an eight-year term of supervised release, is adequate to satisfy the goals of punishment.

I further find that the sentence imposed is sufficient to deter both Mr. Moreland and the general public from committing similar offenses. Additionally, as Brian Moreland will be under the careful watch of the Bureau of Prisons and the Probation Department until he is 49 years old, I am confident that this sentence will protect the public from any further crimes of the defendant. Mr. Moreland has not demonstrated a pattern of recidivism or violence that would justify or necessitate a greater term of imprisonment. Further, to impose a sentence which is 20 years longer would cost the taxpayers an enormous amount of money. Twenty more years would cost the taxpayers more than half a million dollars.

*C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

Section 3553(a) next directs the sentencing judge to consider the need to avoid unwarranted disparity at sentencing. This factor initially seems to encourage deference to the Guideline range, because the Guidelines were developed to eliminate unwarranted sentencing disparities in federal courts. In practice, however, the focus of the Guidelines has gradually moved beyond elimination of *unwarranted* sentencing disparities towards the goal of eliminating *all* disparities. This goal, as I will explain further, is not only impractical but undesirable.

There are inherent disparities in every criminal prosecution because the criminal justice system is filled with discretion commencing at the time of arrest. Disparity may arise initially based on judgments made by the officer at the scene of the crime regarding the amount of incriminating evidence, the reputation of the suspect, or the perceived seriousness of the crime. Those initial judgments may determine whether the suspect is arrested in the first place. Next, assuming an arrest has been made, the officer must then decide whether to take the case to prosecutors in federal or state court.[2] Sometimes the options may include different state courts, different magistrate judges, or even different counties within a state.



Once the venue has been determined, the prosecutors begin to exercise discretion over the case. At this point, the prosecutor's perception of the seriousness of the crime may play a role in determining whether the suspect is indicted, as will the available evidence, the defendant's reputation, the defendant's criminal history, and the defendant's ability to assist the investigation of other criminal activity. Further, assuming the prosecutor decides to seek an indictment, the prosecutor has discretion regarding the specific crimes to be charged and presented to the Grand Jury. In addition, the prosecutor has the discretion to accept a variety of different plea agreements during the plea negotiation process.

None of these examples of discretion and disparity are necessarily undesirable. All criminal justice systems are created by humans, run by humans, and subject to human error and discretion at every level. Obviously, it is important to eliminate abusive and unreasonable exercises of discretion to the fullest extent possible. Exercises of discretion that lack guided judgment lead to the *unwarranted* disparities that the Guidelines were originally intended to extinguish. Removing human discretion entirely, however, removes humanity from the process and leaves only a soulless algorithm. The system works best when we trust people who are informed and well-trained to exercise appropriate discretion at all levels of the process. Humanity and the well-reasoned exercise of discretion lead to *warranted* sentencing disparities that are not only desirable, but necessary to achieve the goals of a just society. The current advisory Guideline system, which permits judges to exercise discretion while still providing guidance, is sound because it allows for human determinations that cannot be made with a calculator or strict adherence to formulae.[3]

2. The facts of the instant case present a perfect example of the vast disparities that can exist between the state and federal criminal justice systems. Mr. Moreland's second prior conviction was for approximately the same amount of cocaine base (6.92 grams) as his conviction for the instant offense (7.85 grams). His punishment for the prior conviction, in Michigan state court, was a suspended sentence of incarceration and lifetime probation. He did not serve a single day in prison. In contrast, his *mandatory minimum* sentence for the instant offense, based solely on the prior marijuana conviction and ignoring the prior cocaine base cocaine conviction, is ten years in prison. 21 U.S.C. § 841(b)(1)(B). And the recommended Guideline sentence, based on the defendant's Career Offender status, is 30 years to life in prison.

3. One commentator, for example, has noted the following "troublesome" contradiction inherent in 18 U.S.C. § 3553:

> The statute directs sentencing courts to consider '(1) the nature and circumstances of the offense and the history and characteristics of the defendant; ... [and] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct....' Judges have a statutory mandate to continue to individualize sentences ... balanced against a directive that those individualized sentences should not vary too much from those of similarly situated defendants. One way to view that tension is to ask what is unwarranted, as opposed to warranted, disparity among defendants. Ultimately, we should determine what matters when we ask whether one bank robber should receive the same sentence as another bank robber.

Ian Weinstein, *The Discontinuous Tradition of Sentencing Discretion: Koon's Failure to Recognize the Reshaping of Judicial Discretion Under the Guidelines*, 79 B.U. L. Rev. 493, 509–10 (1999).

We fool ourselves by thinking that a sentencing Guideline regime that carefully cabins offenses into little boxes of discrete and small ranges of sentencing is sufficient to achieve uniformity of treatment, or by thinking that uniformity of treatment is necessarily desirable. The Career Offender provisions of the Guidelines, as applied to this case, perfectly exhibit the shallowness of a presumptively reasonable Guideline approach. Two relatively minor and non-violent prior drug offenses, cumulatively penalized by much less than a year in prison, vaulted this defendant into the same category as major drug traffickers engaged in gun crimes or acts of extreme violence. The Career Offender provision provides no mechanism for evaluating the relative seriousness of the underlying prior convictions. Instead of reducing unwarranted sentencing disparities, such a mechanical approach ends up creating additional disparities because this Guideline instructs courts to substitute an artificial offense level and criminal history in place of each individual defendant's precise characteristics. This substitution ignores the severity and character of the predicate offenses and equates relatively minor distribution convictions with violent and egregious drug trafficking crimes for sentencing purposes. In the instant case, for example, I examined the defendant's prior convictions and found that they were non-violent and relatively minor. Accordingly, after calculating the advisory Guideline range, including the Career Offender provisions, I found it necessary to disregard the advice of Guidelines and sentence the defendant to the mandatory minimum of ten years in prison. Notably, this sentence still exceeds his "pure" Guideline sentencing range of 78 to 97 months, based on an offense level of 26 and a criminal history category of III.

## V. Conclusion

Having considered the advisory Guideline range and the factors enumerated in § 3553(a), I determined that a sentence of ten years in prison, followed by an eight-year term of supervised release, was an appropriate and reasonable sentence. This sentence reflects the nature and circumstances of the instant offense, which is a non-violent drug crime of relatively minor proportions. It also reflects the history and characteristics of the defendant-a young individual who has exercised poor judgment on multiple occasions but who has also tried to educate himself and improve his life. This sentence further reflects the seriousness of the instant offense and the characteristics of his prior convictions. A ten year period of incarceration provides just punishment and will promote respect for the law. It will also deter this defendant from future misconduct, will deter other individuals contemplating similar crimes, and will protect the public from future crimes of this defendant. This sentence recognizes the inherent futility of attempting to eliminate all disparity in the criminal justice system, yet also attempts to align the sentence of this defendant with that of other defendants with similar records who have been found guilty of similar conduct.

Finally, this case illustrates the inherent problems with treating the Guideline advice as presumptively reasonable. The advisory Guideline range in this case was 360 months to life in prison. Accordingly, if one insists on treating the Guidelines as presumptively reasonable, one must believe it would be reasonable to sentence Mr. Moreland to life in prison for three non-violent crimes involving minor amounts of controlled substances. I found, in light of all of the circumstances of this case, that a life sentence would not only be unreasonable, but also unconscionable. Accordingly, and in light of all of the other § 3553(a) factors, I declined to accept the advice of the Guidelines and sentenced Mr. Moreland to ten years in prison to be followed by an eight-year term of supervised release.

The court **DIRECTS** the Clerk to send a copy of this written opinion to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal, and **DIRECTS** the Clerk to post this published opinion at *http://wvsd.uscourts.gov.*






**Kenneth M. BOUDREAUX and William J. Nolan**

v.

**BANCTEC, INC.**

**No. Civ.A. 03–2111.**

United States District Court, E.D. Louisiana.

Feb. 22, 2005.

**Background:** Computer repair technicians sued former employer, alleging that employer failed to pay them for all their compensable time. Parties made cross-motions for partial summary judgment.

**Holdings:** The District Court, Berrigan, J., held that:

(1) fact issues existed regarding nature of technicians' principal work activities;

(2) fact issues existed whether technicians were employees or independent contractors;

(3) fact issues existed whether employer acted in good faith in preventing technicians from reporting overtime hours;

(4) fact issues existed whether technician suffered retaliation after reporting wage grievance; and

(5) fact issues existed whether wage claim was estopped.

Motions denied.

**1. Labor and Employment ⚷2312**

Under Fair Labor Standards Act (FLSA), any work from which employer derives significant benefit or that is integral and indispensable part of principal activities for which covered workmen are employed is compensable, even if done outside regular work shift. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**2. Labor and Employment ⚷2316**

"Preliminary activity," such as waiting to check in and out of work, turning on machinery, or waiting in line to receive checks, is non-compensable under Fair Labor Standards Act (FLSA). Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Labor and Employment ⚷2316**

"Preliminary activities" that are non-compensable under Fair Labor Standards Act (FLSA) include checking in or out and waiting in line to do so, changing clothes, washing up or showering, putting on aprons or overalls, removing shirts, taping arms, and turning on switches for lights. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.

**4. Federal Civil Procedure ⚷2498**

Genuine issues of material fact, regarding whether activities for which computer repair technicians sought compensation were principal activities, precluded